Document Number Case Number
06-C-0719-S
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
12/08/2006 05:49:28 PM CST

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

**DENNIS HECKER, JONNA DUANE,
WILLIAM WALLACE, ROGER BRADLEY,
individually and on behalf of all those
similarly situated**

      **Plaintiffs,**

v.

**DEERE & COMPANY, FIDELITY
MANAGEMENT TRUST COMPANY, and
FIDELITY MANAGEMENT & RESEARCH
COMPANY,**

      **Defendants.**

**CASE NUMBER: _____**

**JURY TRIAL DEMANDED
CLASS ACTION COMPLAINT**

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY

### INTRODUCTION

1.    Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement. For many employees in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

2.    In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts. The accounts provide a number of investment alternatives into which employees place a portion of their current income with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.    Accordingly, in 401(k) plans, the return on employees' investments is critical. Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.      While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.      The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.      Unlike generalized market fluctuations, employers can control these fees and expenses. Federal law requires them to do so.

7.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor." The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such. Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan. The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industry. ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.      For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9.      At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

10.     In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and

beneficiaries of the John Deere Savings & Investment Plan, Plan No. 003, (the "Plan"),
seek to recover the losses suffered by the Plan on a plan wide basis and to obtain
injunctive and other equitable relief for the Plan from the Plan's fiduciaries based upon
the fiduciaries' breaches of fiduciary duties.

11.     As set forth in detail below, the fees and expenses paid by the Plan, and
thus borne by Plan participants, were and are unreasonable and excessive; not incurred
solely for the benefit of the Plan and its participants; and undisclosed to participants. By
subjecting the Plan and its participants to these excessive fees and expenses, and by other
conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs

12.     Plaintiff and Class Representative Dennis Hecker lives in Mercer,
Wisconsin, within the Western District of Wisconsin.  He is a participant in the Plan
within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

13.     Plaintiff and Class Representative Jonna Duane lives in Madison,
Wisconsin, within the Western District of Wisconsin.  She is a participant in the Plan
within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

14.     Plaintiff and Class Representative William Wallace lives in Horicon,
Wisconsin.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C.
§ 1002(7).

15. Plaintiff and Class Representative Roger Bradley lives in Beaver Dam, Wisconsin. He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

## Defendants

16. Defendant Deere & Company ("Deere") manufactures heavy equipment for use in the agriculture, construction, forestry and landscaping sectors. It is one of the world's two leading agricultural machinery manufacturers and employs more than 47,000 people in 26 countries. Within the United States, it has major operations in Illinois, Wisconsin, Minnesota, North Dakota, Iowa, Louisiana, and Georgia. It is registered to do business in Wisconsin and employs several hundred people at its Madison and Horicon facilities.

17. Deere is the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and is also an administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1102(16)(A). In its role as administrator, it has the authority and discretion to select the investments available to Plan participants and beneficiaries, and to control and manage the operation and administration of the Plan. It is a "named fiduciary" within the meaning of ERISA § 402, 29 U.S.C. § 1102, and is also a fiduciary with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

18. Defendant Fidelity Management Trust Company ("FMTC") is a Massachusetts corporation with its headquarters in Boston. FMTC is a trust company and manages assets for approximately 550 institutional clients worldwide with $113

billion in assets under management as of March 2006. FMTC is a subsidiary of Fidelity Investments, one of the world's largest money managers.

19.    Because ERISA requires that the assets of the Plan be held in trust, pursuant to a written trust agreement, ERISA, § 403, 29 U.S.C. § 1103(a), Defendant Deere, as Plan sponsor and administrator, designated FMTC the trustee of the "John Deere Savings and Investment Plan Trust," which holds the assets of the Plan. In addition, FMTC is the Plan's record keeper, performing a variety of administrative tasks for the Plan. FMTC also directly manages at least two of the investment options available to Plan participants and is thus a fiduciary to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

20.    FMTC also played a role in the selection of the investment options the Plan makes available to participants. Although Deere as Plan Administrator had final authority for the selection of the investment options, Deere and FMTC agreed that Deere would limit its selection to those securities issued by investment companies for which FMTC's affiliate company, Fidelity Management & Research Company, serves as investment advisor or for which FMTC itself provides investment advice, subject to an exception for certain pre-existing guaranteed investment contracts (GICs) and the Deere Common Stock Fund.. For these reasons, FMTC is a fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

21.    Defendant Fidelity Management & Research Company ("FMRCo") is a registered investment company that acts as the investment advisor to the Fidelity family of mutual funds. It is a subsidiary of Fidelity Investments and an affiliate of FMTC. The

Fidelity funds are marketed throughout the United States through a variety of distribution channels, including Fidelity investment centers and over the internet at Fidelity.com.

22.    FMRCo is the investment advisor for 23 out of the 26 investment options available to Plan participants. It is paid by the Plan (and thus by the participants and beneficiaries) for its services. It maintains an active Revenue Sharing program, charging more for its services than it expects to keep in order to have additional monies with which to pay its business partners.

## Jurisdiction And Venue:

23.    Plaintiffs seek relief on behalf of the Plan through the mechanisms found in ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

24.    The Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

25.    Venue of this action is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the injury occurred directly to Plaintiffs in this district where they live and work, because the breaches of fiduciary duty occurred in this district and because the Defendants may be found in this district.

## The Plaintiff Class

26.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated Plan participants and beneficiaries. They seek to represent the following class (the "Class"):

> All persons, *excluding individual employees who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the Plan and who are, were or may have been affected by the

conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

27.     Certification of this class is proper under Rule 23(a) because all of its prerequisites are satisfied:

a.  **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of class members as of the date of filing, there were 21,009 participants with account balances in the Plan at the end of the 2004 plan year.

b.  **Commonality.** Common issues of fact and law predominate over any issues unique to individual class members.  Issues that are common to all class members include, but are not limited to, whether one or more of the Defendants:

i.   Charged fees and expenses to the Plan that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

ii.   Caused the Plan to enter into agreements which in turn caused and/or allowed the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

iii.   Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused or allowed the Plan to pay fees

and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

iv. Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k) retirement industry collect payments and other revenues from 401(k) plans;

v. Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

vi. Failed properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

vii. Failed to inform and/or disclose to Plan participants in proper detail and clarity the transaction fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

viii. Failed to disclose that hidden and excessive fees were and are being assessed against Plan assets and failed to stop such hidden excessive fees;

ix. Failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity

and familiar with such matters when charging, causing to be charged or paid, or failing to monitor the fees and expenses of the Plan;

x.   Caused and/or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

xi.   Breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class by engaging in the conduct set forth in this Complaint, revealed in discovery and/or proven at trial;

xii.   Are liable to the Plan and the Class for losses suffered as a result of the breaches of their fiduciary and other ERISA-imposed obligations;

xiii.   Are responsible to account for the assets and transactions of the Plan and should be charged for any transactions and payments for which they cannot account;

xiv.   Are responsible in equity to make restitution of monies that in good conscience belong to the Plan and its participants and beneficiaries.

c.   **Typicality.** The Claims brought by the Plaintiffs are typical of those of the absent class members because:

i.   The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and each member of the Class;

  ii. The Defendants' breach of those obligations constitutes a breach to each participant and each member of the Class;

  iii. To the extent that there are any differences among the Class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Plan. Such minimal and formulaic differences are no impediment to class certification.

 d. **Adequacy of Representation.** The Plaintiffs are adequate representatives of the absent class members and will protect such absent class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the class claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

28. Class certification is also appropriate under Rule 23(b) and each subpart because:

 a. Pursuant to Rule 23(b)(1), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members and adjudications with respect to individual class members would be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interests;

b.  Pursuant to Rule 23(b)(2), as set forth above, the Defendants have

acted on grounds generally applicable to the Class as a whole;

c.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law

and fact predominate over any purely individual issues and thus a class

action is superior to any other method for adjudicating these claims.

## FACTS

### The Plan

29.    Deere offers certain of its employees the opportunity to participate in the

Plan, as part of their compensation and benefits.  The Plan is a "defined contribution

plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34) and contains an employee

stock ownership plan provision.  It is also a tax-qualified plan of the type popularly

known as a "401(k) plan."

30.    Deere benefits from its sponsorship of the Plan because giving employees

the opportunity to participate in the Plan enhances Deere's ability to recruit and retain

qualified personnel, fosters employee loyalty and goodwill, and entitles Deere to tax

advantages under the Internal Revenue Code.

31.    The Plan was established and is operated under a Plan Document. Under

the terms of the Plan, qualified employees may contribute certain portions of their before-

tax earnings to the Plan.  Deere will match those contributions in varying percentages up

to 6 %.  It may also make a profit-sharing contribution to some participants.  All

participants are 100 percent vested in their contributions and allocated net earnings.

Some participants – those electing the "Traditional Option" – are 100% vested in the

matching contribution portion at all times, while other participants – those electing the

"Contemporary Option – are not fully vested in their matching contributions until after three years of service.

32. Each participant's account is credited with the participant's contributions, the participant's share of Deere's matching contributions and discretionary profit-sharing contributions, if any, and the Plan's earnings and losses allocated daily based on the ratio of the participants respective account balances. FMTC, in its role as Plan record keeper, has the responsibility for keeping track of the individual accounts.

33. As noted above, the assets of the Plan are held in the "John Deere Savings and Investment Plan Trust." In 1990, Defendants Deere and FMTC entered into a trust agreement in which FMTC agreed to provide trustee and recordkeeping services to the Plan, and to be a fiduciary with respect to certain investments.

34. In the document, which has been amended at least 27 times without substantially changing this provision, FMTC disavows any responsibility for selecting the investment options or for rendering advice regarding the selection of investment options. However, the parties agreed that Deere's selection of mutual funds would be limited to funds operated or advised by FMTC or FMRCo, with an exception for certain pre-existing investments and for the company stock fund.

35. Thus, as of approximately 2004, participating employees could invest Plan contributions in any of 26 investment options selected by Deere subject to the limitations imposed in the agreement with FMTC. Twenty-three of the available options are retail mutual funds operated by FMRCo – the same mutual funds that FMRCo and its parent Fidelity Investments make available to investors large or small on the open market.

36.     In addition to the retail mutual funds, the Plan offers two funds managed directly by Fidelity, the "Blended Interest Fund" and the "Fidelity Intermediate Collective Pool." These two options are similar to mutual funds in that they pool money and invest in many different underlying securities. FMTC acts as the investment advisor to these two funds, choosing the amount of each security held. In the agreement, it acknowledges that it is a fiduciary with respect to these funds.

37.     The Plan also offers participants the option of investing in the Deere Common Stock Fund, a fund that holds Deere & Company common stock.

38.     By the end of 2005, the Plan had more than $2 billion in assets. More than $1.3 billion of those Plan assets are held in Fidelity retail mutual funds.

### Fiduciary Duties Owed To The Plan Under ERISA

39.     ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the **exclusive purposes of providing benefits** to participants in the plan and their beneficiaries **and defraying reasonable expenses of administering the plan.**

(Emphasis added).

40.     ERISA §§ 404(a)(1)(A)&(B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) & (B), require that Plan fiduciaries, including the Defendants, "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and:

    a. [F]or the exclusive purpose of:
        i.   providing benefits to participants and their beneficiaries; and
        ii.   defraying reasonable expenses of administering the plan; and
    b. [W]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

41.    ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be held liable for breaches of fiduciary duty committed by another fiduciary where

> (1) the fiduciary "participates knowingly in or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach";
> (2) the fiduciary, by his or her "failure to comply with section 1104(a) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary" enables "such other fiduciary to commit such a breach"; or
> (3) the fiduciary "has knowledge of a breach by such other fiduciary," and does not make "reasonable efforts under the circumstances to remedy the breach."

42.    ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and "parties in interest." This section provides that unless subject to an exemption as set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary

> shall not cause the plan to engage in a transaction …if he knows or should know that such a transaction constitutes a direct or indirect – sale or exchange, or leasing, of any property between the plan and a party in interest …furnishing of goods, services or facilities between the plan and a party in interest …transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

43.    For purposes of section 406, a "party in interest" is any plan fiduciary, including the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above. ERISA § 3(14), 29 U.S.C. § 1002(14).

44.    Similarly, a fiduciary such as Deere or Fidelity (1) shall not "deal with the assets of the plan in his own interest or for his own account"; (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan" or its participants and beneficiaries; and (3) shall

not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).

45.    ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that Deere, as the Plan Administrator, periodically provide to Plan participants and beneficiaries a summary plan description (an "SPD").

46.    ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that Deere, as the Plan Administrator, at least annually provide to Plan participants and beneficiaries copies of statements and schedules from the Plan's annual report for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

47.    The schedules and statements that Deere, as the Plan Administrator, annually must provide to Plan participants and beneficiaries specifically include:

   a.  [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and
   b.  [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

See ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

48.    ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and beneficiaries to receive more detailed information from Deere, as the Plan Administrator, on request:

   The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

49.     ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among

other extensive disclosures, Deere, as a Plan fiduciary, must include in the Plan's

"Annual Report"

> a statement of [the Plan's] assets and liabilities, and a statement of
> changes in net assets available for plan benefits which shall include details
> of revenues and expenses and other changes aggregated by general source
> and application.

50.     ERISA § 404(c) provides to Plan fiduciaries a "Safe Harbor" from liability

for losses that a participant suffers in his or her 401(k) accounts to the extent that the

participant exercises control over the assets in his or her 401(k) accounts.  To be eligible

for the protection of this "safe harbor," Deere, as a Plan fiduciary, must, among other

things, have provided:

> a.  an opportunity for a participant or beneficiary to exercise control over
>     assets in his individual account, and
> b.  a participant or beneficiary an opportunity to choose, from a broad
>     range of investment alternatives, the manner in which some or all of
>     the assets in his account are invested.

29 C.F.R. §2550.404c-1(b)(1).

51.     For a participant or beneficiary to have "an opportunity to exercise control

over assets in his individual account," Plan fiduciaries must provide him or her with "the

opportunity to obtain sufficient information to make informed decisions with regard to

investment alternatives under the Plan." 29 C.F.R. §2550.404c-1(b)(2)(B).

52.     The "sufficient investment information" that Deere, as a Plan fiduciary,

must have provided includes:

> A description of any transaction fees and expenses which affect the
> participant's or beneficiary's account balance in connection with purchases
> or sales of interests in investment alternatives (e.g., commissions, sales
> load, deferred sales charges, redemption or exchange fees).

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(1)(v)*. At least upon request, it must include

> A description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative.

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*.

53. ERISA's Safe Harbor Regulations state that the imposition of *reasonable* charges for *reasonable* Plan expenses does not interfere with a participant's opportunity to exercise control over his or her individual account so long as *Plan fiduciaries inform the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, *provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

### The Fees and Expenses Assessed Against The Plan

54. Defendant Deere, directly or indirectly, has caused the Plan to purchase services from various plan service providers, including trustee, record-keeping, administration, investment advisory, investment management, brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services.

55. Plan service providers, such as Fidelity, receive payment in at least one of two ways:

> a. By direct disbursement from the Plan; and/or

b. By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between and/or among various service providers.

**"Hard Dollar" Payments to Plan Service Providers**

56. Payments in the form of direct disbursements from a 401(k) plan to participants or an entity providing a service to the plan are characterized as "Hard Dollar" payments.

57. 401(k) plans must disclose to government regulators and plan participants, in one form or another, Hard Dollar payments made from the plan to service providers.

58. The Plan has stated in its filings with the government regulators that the Plan pays no administrative expenses. Upon further inquiry by participants, the Plan stated that Deere, as Plan Sponsor, pays all of the expenses of the Plan in accordance with the Plan documents.

59. Whether or not this is correct with respect to Hard Dollar expenses, these Hard Dollar expenses are not all of the fees that FMTC and FMRCo charge or collect in exchange for the services they provide to the Plan.

**Revenue Sharing Payments to Plan Service Providers**

60. Revenue Sharing is a common practice in the financial, securities, and investment industry that provides services to 401(k) plans.

61. Industry commentators and analysts consider Revenue Sharing to be the "big secret of the retirement industry."

62. Industry commentators and analysts generally define "Revenue Sharing" as the transfer of asset-based compensation from brokers or investment management

providers (such as the mutual funds advised by FMRCo, and also common or collective trusts, insurance companies offering GICs, and similar pooled investment vehicles) to administrative service providers (such as FMTC in its role as record-keeper and trustee, as well as administrators and/or consultants) in connection with 401(k) and other types of defined contribution plans.

63.    For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to select an investment vehicle (mutual fund, common or collective trust, guaranteed investment contracts, etc. (collectively "Fund")) to be offered to plan participants as an investment option will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing.

64.    In Revenue Sharing arrangements, the Plan and the Fund agree upon an asset-based fee that is not the true price for which the Fund will provide its service.

65.    Instead, the Fund's agreed asset-based fee includes *both* the actual price for which the Fund will provide its service *and* additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

66.    The additional portion of the agreed-upon asset-based charge is "shared" with Plan service providers or others who do business with the Plan or the Fund.

67.    As a result of Revenue Sharing arrangements, Plan service providers, such as Fidelity, or others who do business with the Plan or the Fund receive *both* a Hard Dollar payment from the Plan *and* additional revenue that the Fund "shares" with them.

68.    The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation:  the amount invested; the level of

sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and inclination to expend effort monitoring Revenue Sharing transfers; the diligence with which the plan's representative conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

69.     Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families and other service providers.

70.     When 401(k) plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

71.     Ascertaining whether the Plan Administrator – in this case Deere – has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against the 401(k) Plan are reasonable and incurred solely in the interest of Plan participants requires consideration whether the *total of both* the Hard Dollar *and* Revenue Sharing payments paid for any category of services complies with this standard.

72.     It is especially important to consider the Revenue Sharing payments because they are based on the total assets under management, rather than on the number of participant accounts serviced. Thus, as the years pass, and the participants' retirement savings grow, the amount of money available for Revenue Sharing payments increases, even though no additional services may be provided to the plan.

73.    Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the plan, plan assets and plan service providers; Revenue Sharing is not always captured and used for the benefit of the plan and the participants.

74.    When Revenue Sharing is foregone, the plan will not only pay additional Hard Dollar fees to the plan service providers (since no Revenue Sharing payments are available to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep.

75.    Consequently, in determining whether a plan administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the plan are reasonable and incurred solely in the interest of plan participants, foregone Revenue Sharing must also be taken into account.

76.    Such is the case here. As is the standard practice for FMTC, FMRCo and their affiliates when providing services to a 401(k) plan, the Plan and the participants and beneficiaries have been charged fees and expenses that include monies with which to make Revenue Sharing payments. In many cases, the amounts allocated for Revenue Sharing payments are more than 1/3 of the total amount collected by FMRCo and its affiliates that operate the mutual funds.

77.    In this case, these Revenue Sharing amounts were retained by FMRCo, FMTC and/or their affiliates as fees for their services. The Revenue Sharing payments kept by FMTC and FMRCo are in addition to any Hard Dollar Fees paid directly to them by Deere.

78.    These Revenue Sharing amounts are in excess of the fees that FMTC and FMRCo would retain if non-affiliated plan service providers were involved. FMTC and FMRCo were able to retain these additional payments because the Plan employs FMTC as both recordkeeper and trustee and because it uses investment options advised by FMRCo and operated by other Fidelity affiliates.

79.    These Revenue Sharing payments – consisting of millions of dollars – were far in excess of reasonable fees for the administrative and/or investment services provided to the Plan by the Fidelity affiliates and far in excess of what a plan of this type must pay for similar services or investment options.

**Revenue Sharing Arrangements Are Not Disclosed to Plan Participants**

80.    Revenue Sharing is not disclosed to Plan participants and government regulators, even though it accounts for a greater portion of service provider payments than do Hard Dollar disbursements to those same providers.

81.    Accordingly, industry commentators and experts have dubbed Revenue Sharing payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce plan participants' retirement savings.

82.    By entering into the agreement with FMTC, and by allowing, and/or failing to monitor, discover, and prevent or recover these undisclosed Revenue Sharing arrangements, Deere deprived Plan participants of true and accurate information regarding:

> a.    How much they are paying in fees and expenses for the Plan;
>
> b.    Who is receiving Plan assets through Revenue Sharing;
>
> c.    How much service providers are paid by the Plan; and

    d.   Whether the total amount paid to services providers (*i.e.* disclosed, hard dollar fees *combined with* Revenue Sharing payments) is reasonable and incurred solely for the participants' benefit.

### Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of Its Fiduciary Breaches

83.    Neither Deere nor FMTC disclosed, and to this day has not disclosed, the fact that FMTC, FMRCo and/or other plan service providers were engaging in Revenue Sharing. They did not disclose that Revenue Sharing was available for the benefit of the Plan and its participants, and they did not disclose the amount of Revenue Sharing payments, made by or to Plan service providers.

84.    In fact, Deere stated exactly the opposite when asked.

85.    Plan participants did not have, and do not have, complete and actual knowledge of the fees and expenses being charged to the Plan that reduced their account balances.

86.    Thus, Plan fiduciaries, including Deere, have not told Plan participants, and Plan participants do not know:

    a.    the "annual operating expenses" of the investment options in the Plan, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*; and

    b.    the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

87.    As a result of Deere's failure and refusal to provide accurate information, and the general failure on the part of either Deere or FMTC to disclose the actual Plan expenses, including the available Revenue Sharing and the fact that Deere and FMTC have a long-standing agreement that Deere will only choose Fidelity-related funds for the

Plan, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan." 29 C.F.R. §2550.404c-1(b)(2)(1)(B).

88.    Because neither of these Defendants has provided the participants with this information, and because both of these Defendants concealed this information from them, the participants have lacked the information necessary to understand and protect their interests in the Plan and/or to have knowledge of, these Defendants' breaches of fiduciary duty.

89.    In fact, in their fiduciary roles, Deere and FMTC are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

90.    These Defendants have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

91.    Their silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

92.    Here, despite the duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis these Defendants failed and refused to disclose to, and inform the participants of:

    a.  the total amount of fees and expenses reasonable and necessary to operate the plan;

    b.  the total amount of amount of fees and expenses the Plan actually paid to service providers;

    c.  the availability of Revenue Sharing;

d.      the true and accurate details regarding the revenues and expenses of
the Plan;

e.      the true and accurate operating expenses which reduce participants'
returns, including both Hard Dollar payments and Revenue Sharing,
for each of the Plan's investment alternatives;

f.      the true and accurate transaction fees and expenses which affect the
participants' account in connection with the purchase or sale of
investment alternatives;

g.      the amount, when both Hard Dollar Payments and Revenue Sharing
are considered, by which the Plan's expenses exceeded those which
were reasonable and incurred solely in participants' interests; and

h.      other revenue and expense information necessary for the participants
to understand and protect their interests in the Plan;

i.      the Defendants' agreement to limit the Plan's investment options to
Fidelity affiliated funds, thereby benefiting FMTC, FMRCo and/or
other Fidelity affiliates.

93.     Based upon the foregoing, the Defendants are not entitled to the safe
harbor protections of ERISA § 404(c).

94.     Based upon the foregoing, the statue of limitations was tolled on the
breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs
actually discovered them.

**COUNT I:**
**Breach of Fiduciary Duty Against Defendants Deere and FMTC**
**ERISA §502(a)(2)**

95.        Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 94 as though fully set forth here.

96.        As set forth in detail above, Deere and FMTC owe the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

a.  To conduct themselves as Plan fiduciaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

b.  To perform their duties as fiduciaries with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

c.  To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

d.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

e.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

f.  To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

g.  In entering into agreements with service providers to the Plan, or in FMTC's case, in entering into agreements with Deere, to ensure that the payments from the Plan – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

h.  In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

i.  In operating and administering the Plan, on an ongoing basis to monitor the payments made by the Plan to service providers such as Fidelity – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

j.   To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry, including FMTC, FMRCo and other Fidelity affiliates, collect payments and other revenues from 401(k) plans;

k.   To inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

l.   To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

m.   To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plan; the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

n.   Upon request, to provide further any information to Plan participants and beneficiaries regarding the operation and administration of the Plan and the expenses incurred in doing so; and

o.   To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

97.      As set forth in detail above, Deere and/or FMTC breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

    a.  Agreeing that the Plan would pay – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

    b.  Allowing or causing the Plan to pay – directly on indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

    c.  Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

    d.  Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

    e.  Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

    f.  Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

g.  Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

h.  Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

i.  Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

j.  Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plan;

k.  By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

98.     As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plan, and the Plan's participants and beneficiaries have suffered financial losses and damages.

99.     Further, as set forth in detail above, the Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. § 1104(c).  Accordingly, the Defendants are not able to make use of this section to avoid liability for any investment losses participants and beneficiaries may have experienced in the Plan.

100.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), the Defendants are liable to restore to the Plan the losses it experienced as a direct result of

the Defendants' breaches of fiduciary duty and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

**COUNT II:**
**Other Remedies for Breach of Fiduciary Duty Against Deere and FMTC**
**– ERISA §502(a)(3)**

101.    Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 100 as though fully set forth here.

102.    As an alternative to the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

103.    Under section 502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

104.    Deere and FMTC are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

105.    These Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

106.    Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from the Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

107.    Accordingly, these Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

108.    As set forth in detail above, these Defendants have caused and/or allowed the plan to pay – directly or indirectly – excess fees and expenses to Plan service providers.

109.    These Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

110.    Accordingly, the Court should order that these Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plan and its assets.

111.    The Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

112.    Plaintiffs respectfully request that to the extent these Defendants do not or cannot account for all such transactions and their property under ERISA, the plan document and other applicable law, the Court surcharge against these Defendants and in favor of the Plan all amounts for which they cannot account.

113.    Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above, and to cause them to cease in order for the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

## COUNT III:
### Other Remedies for Breach of Fiduciary Duty Against FMTC and FMRCo ERISA §502(a)(3)

114.    Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 113 as though fully set forth here.

115.    As a further alternative to the causes of action stated in Count I, Plaintiffs seek further relief against Defendants FMTC and FMRCo pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

116.    One form of equitable relief available under section 503(a)(3) is equitable restitution.

117.    By secretly charging the Plan for and retaining the Revenue Sharing payments described above, Defendants FMTC and FMRCo obtained funds that should have been used solely for the benefit of Plan participants and beneficiaries for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

118.    FMTC and FMRCo knew or should have known that those Revenue Sharing payments were the Plan's assets and that they should have been used solely for the benefit of Plan participants and beneficiaries for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

119.    Because the Revenue Sharing payments were used for purposes not permitted by ERISA, these monies rightfully and in good conscience belong to the Plan and its participants and beneficiaries.

120.    The Revenue Sharing payments are specifically identifiable funds.

121.    The Revenue Sharing payments are in the possession and custody of FMTC or FMRCo.

122.    Plaintiffs, on behalf of the Plan, seek equitable restitution of the Revenue Sharing payments, along with any profit, from FMTC and/or FMRCo.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and/or cause the Defendants to disgorge such monies and return them to the Plan;

- remove any fiduciary who has breached his or her fiduciary duties and/or enjoin the fiduciary from future breaches of ERISA;

- award actual damages to the Plan in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and grant any other and further relief the Court deems appropriate

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL COUNTS SO TRIABLE.**

Dated:  December 8, 2006                    Respectfully submitted,


                                           **Schlichter, Bogard & Denton**

                                           Roger Denton
                                           Jerome J. Schlichter
                                           Elizabeth J. Hubertz
                                           Nicole Bolton
                                           8554 Highway 51, Suite 208
                                           P.O. Box 5
                                           Minocqua, WI 54548

                                           100 South Fourth Street
                                           Suite 900
                                           St. Louis, MO 63102
                                           Tel:    314-621-6115
                                           Fax:    314-621-7151
                                           rdenton@uselaws.com
                                           ehubertz@uselaws.com
                                           nbolton@uselaws.com
                                           Lead Counsel for Plaintiffs

Kim Grimmer
SOLHEIM BILLING & GRIMMER S.C.
U.S. Bank Plaza, Suite 301
One South Pinckney Street
P.O. Box 1644
Madison, WI 53701
Tel:    608-282-1200
Fax:    608-282-1218
kgrimmer@sbglaw.com
Local Counsel for Plaintiffs