CERTIFIED COPY

A True Copy
Teste:



Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 07-3605 & 08-1224

DENNIS HECKER, *et al.*,

*Plaintiffs-Appellants*,

*v.*

DEERE & COMPANY, FIDELITY MANAGEMENT
TRUST CO., and FIDELITY MANAGEMENT
& RESEARCH CO.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 06-C-719-S—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 4, 2008—DECIDED FEBRUARY 12, 2009

Before MANION, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.*   Even before the stock market
began its precipitous fall in early October 2008, litigation
over alleged mismanagement of defined contribution
pension plans was becoming common. This type of litiga-
tion received a boost when, in *LaRue v. DeWolff, Boberg &
Associates, Inc.,* 128 S.Ct. 1020 (2008), the Supreme Court

held that "a participant in a defined contribution pension plan [may] sue a fiduciary whose alleged misconduct impaired the value of plan assets in the participant's individual account." 128 S.Ct. at 1022. Section 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), provides the basis for such an action.

The present case requires us to look further into two questions: first, how broadly does the concept of actionable misconduct sweep, and second, does someone who serves as the manager and investment advisor for a 401(k) plan, or for some of the plan's investment options, owe fiduciary duties to the sponsor's employees. These questions arise in a lawsuit brought by some employees of Deere & Company, which sponsors two 401(k) plans relevant to this case. Fidelity Management Trust Company ("Fidelity Trust") is the directed trustee and recordkeeper for the Deere plans; it also manages two of the investment vehicles available to plan participants. Fidelity Management & Research Company ("Fidelity Research") is the investment advisor for the mutual funds offered as investment options under Deere's plans.

Named plaintiffs Dennis Hecker, Jonna Duane, and Janice Riggins ("the Hecker group"), seeking to sue both on their own behalf and for a class of plan participants, asserted in their second amended complaint ("Complaint") that Deere violated its fiduciary duty under ERISA by providing investment options that required the payment of excessive fees and costs and by failing adequately to disclose the fee structure to plan participants. The Hecker group also sued Fidelity Trust and Fidelity Research on

the theory that they were functional fiduciaries for the class and thus they too were liable under § 1132(a). All three defendants moved to dismiss for failure to state a claim, see FED. R. CIV. P. 12(b)(6). The district court concluded that the case could be resolved at that preliminary stage, granted the motions to dismiss without resolving the class certification motion, and entered judgment for the defendants. Later, the court also denied plaintiffs' motion under Rule 59(e). We conclude that the district court correctly found that plaintiffs failed to state a claim against any of the defendants, and we therefore affirm the district court's judgment.

## I

### A

In 1990, Deere engaged Fidelity Trust to serve as trustee of two of the 401(k) plans ("the Plans") it offers to its employees. The Plans, everyone agrees, are subject to ERISA, and the three named plaintiffs are participants in them. Under its arrangement with Deere, Fidelity Trust was required to advise Deere on what investments to include in the Plans, to administer the participants' accounts, and to keep records for the Plans.

Each Plan offered a generous choice of investment options for Plan participants: the menu included 23 different Fidelity mutual funds, two investment funds managed by Fidelity Trust, a fund devoted to Deere's stock, and a Fidelity-operated facility called BrokerageLink, which gave participants access to some

2,500 additional funds managed by different companies. Fidelity Research advised the Fidelity mutual funds offered by the Plans. Each plan participant decided for herself where to put her 401(k) dollars; the only limitation was that the investment vehicle had to be one offered by the Plan. Each fund included within the Plans charged a fee, calculated as a percentage of assets the investor placed with it. The Hecker group alleges that Fidelity Research shared its revenue, which it earned from the mutual fund fees, with Fidelity Trust. Fidelity Trust in turn compensated itself through those shared fees, rather than through a direct charge to Deere for its services as trustee. As the Hecker group sees it, this led to a serious—in fact, impermissible—lack of transparency in the fee structure, because the mutual fund fees were devoted not only to the (proper) cost of managing the funds, but also to the (improper) cost of administering Deere's 401(k) plans.

Distressed primarily by the fee levels, the Hecker group filed this suit individually and on behalf of a class against Deere, Fidelity Trust, and Fidelity Research, asserting that all three defendants had breached their duties under ERISA. The second amended complaint is the version on which the district court based its ruling. Paragraph 11 summarizes the plaintiffs' theory as follows: "... the fees and expenses paid by the Plans, and thus borne by Plan participants, were and are unreasonable and excessive; not incurred solely for the benefit of the Plans and the Plans' participants; and undisclosed to participants. By subjecting the Plans and the participants to these excessive fees and expenses, and by

other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA."

As we have already noted, Deere appointed Fidelity Trust to be trustee of the Plans. Fidelity Trust also performed administrative tasks for the Plans and managed two of the investment options available to the participants. Deere and Fidelity Trust agreed that Deere would limit the selections available to Deere's employees to Fidelity funds, with the exception of the Deere Common Stock Fund and some other minor guaranteed investment contracts. Fidelity Research served as the investment advisor for 23 out of the 26 investment options in the Plans. None of the Fidelity Research funds operated exclusively for Deere employees; all were available on the open market for the same fee. The Complaint alleges that Fidelity Research "maintains an active Revenue Sharing program, charging more for its services than it expects to keep in order to have additional monies with which to pay its affiliates and business partners." Those charges, plaintiffs allege, were excessive and unreasonable. Deere, in their view, failed to monitor Fidelity Trust's actions properly and failed to keep the participants properly informed.

A few more details about the Plans themselves are helpful. One plan was called the Savings & Investment Plan, or SIP, and the other was the Tax Deferred Savings Plan, or TDS. For all practical purposes, they operated the same way. Qualified employees could contribute up to a certain amount of their pre-tax earnings, and Deere would match those contributions in varying percentages

Nos. 07-3605 & 08-1224

up to 6%. Deere also made profit-sharing contributions on behalf of some participants. All participants were fully vested from the start with respect to their own contributions and were vested after three years' service with respect to the Deere contribution. By the end of 2005, the SIP had more than $2 billion in assets; more than $1.3 billion of that was held in Fidelity retail mutual funds. The TDS had more than $500 million in assets by that time, $244 million of which were held in Fidelity retail mutual funds.

### B

Almost twenty years ago, the Supreme Court observed that "ERISA abounds with the language and terminology of trust law." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 110 (1989). The Act's fiduciary responsibility provisions, found at 29 U.S.C. §§ 1101-14, are central to the Hecker group's case. Plaintiffs begin with § 1103(c)(1), which says that, except as provided in certain other parts of the statute, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." Plan fiduciaries must discharge their duties "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Section 1104 recognizes an exception to that duty, however, for plans that delegate control over assets directly to the participant or beneficiary. The key language reads as follows:

(c) Control over assets by participant or beneficiary

(1)(A) In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)--

> (i) such participant or beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and

> (ii) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control, except that this clause shall not apply in connection with such participant or beneficiary for any black-out period during which the ability of such participant or beneficiary to direct the investment of the assets in his or her account is suspended by a plan sponsor or fiduciary.

29 U.S.C. § 1104(c)(1). Finally, the Hecker group relies on 29 U.S.C. § 1105(a), which provides that one fiduciary may be liable for breaches of fiduciary duty committed by another fiduciary under specified circumstances.

## C

The district court disposed of the case on the pleadings, as we noted above. In evaluating the case, the court had

to decide whether the Complaint included "enough facts to state a claim to relief that is plausible on its face." *Khorrami v. Rolince*, 539 F.3d 782, 788 (7th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007)); see *Davis v. Indiana State Police*, 541 F.3d 760, 763-64 (7th Cir. 2008). Even after *Twombly*, courts must still approach motions under Rule 12(b)(6) by "constru[ing] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

  Looking first at plaintiffs' claims against Deere, the district court found that the company had complied with all applicable disclosure requirements found in ERISA. It saw nothing in the statute or regulations that required Deere to disclose the fact that Fidelity Research was sharing part of the fees it received with its corporate affiliate, Fidelity Trust. Materials furnished to plan participants did disclose the expenses actually paid to the fund managers, as plaintiffs implicitly conceded by alleging that the same fees were charged to all retail fund customers. The district court found it unremarkable that those fees included some profit margin for Fidelity Research. It also thought it "unlikely" that the fund sponsor (Deere) would be able to control the way in which the fund manager distributed its profits, particularly among related corporations. The court also noted that there were proposals to amend the regulations so that revenue sharing arrangements would be disclosed. See Proposed Rules, Department of Labor, Employee Benefits Security Administration, 71 Fed. Reg. 41,392, 41,394 (July 21, 2006).

This, it thought, made it apparent that the present rules imposed no such obligation. Finally, the court rejected the plaintiffs' argument that disclosure was required as a general matter of ERISA law.

The Hecker group also asserted that Deere and the Fidelity companies breached their fiduciary obligations by selecting for the Plans investment options with unreasonably high fees. ERISA, the court acknowledged, requires a fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). But (as we already have observed) the statute also provides a "safe harbor" for plans that permit the participant to exercise control over his or her own assets. 29 U.S.C. § 1104(c). Assuming that the "safe harbor" provision establishes an affirmative defense, the court held that the defendants could take advantage of the defense only if the facts asserted in the Complaint established all of its necessary elements, as set forth in 29 C.F.R. § 2550.404c-1. It then concluded that the defendants had met that burden, explaining itself as follows:

> Participants could choose to invest in twenty primary mutual funds and more than 2500 others through BrokerageLink. All of these funds were also offered to investors in the general public so expense ratios were necessarily set to attract investors in the marketplace. The expense ratios among the twenty

primary funds ranges from just over 1% to as low as .07%. Unquestionably, participants were in a position to consider and adjust their investment strategy based in part on the relative cost of investing in these funds. It is untenable to suggest that all of the more than 2500 publicly available investment options had excessive expense ratios. The only possible conclusion is that to the extent participants incurred excessive expenses, those losses were the result of participants exercising control over their investments within the meaning of the safe harbor provision.

Last, the district court held that since plaintiffs had failed to state a claim against Deere for breach of fiduciary duty either for failure to disclose or for the selection of investment options, Fidelity could not be held liable either. Moreover, it added, neither Fidelity defendant had fiduciary responsibilities with respect to either of the tasks plaintiffs targeted. Under the trust agreements, Deere had the sole responsibility for the selection of plan investment funds. Thus, even if the Fidelity defendants were fiduciaries for some purposes, they were not fiduciaries for the purpose of making plan investment decisions.

After the court dismissed their case, plaintiffs moved for reconsideration under FED. R. CIV. P. 59(e), asserting that they had new evidence that would establish (1) the defendants' breach of duty in assessing fees and choosing investment options, (2) the fact that the defendants' failure to provide information about revenue sharing was an independent violation of ERISA, and (3) the

impropriety of the court's evaluating the "safe harbor" defense on a motion to dismiss. Finding nothing new in their arguments or evidence, the court denied the motion. Later, it awarded costs in the amount of $54,396.57 for Deere and $163,814.43 for the two Fidelity defendants. This appeal followed. In addition to briefs from the parties, the court has had the benefit of *amicus curiae* briefs filed by the Secretary of Labor (supporting plaintiffs) and by a consortium composed of the ERISA Industry Committee, the National Association of Manufacturers, and the American Benefits Council (supporting defendants).

## II

The Hecker group has offered numerous reasons for sending this case back to the district court. For convenience, we have organized the issues as follows: (1) did the district court commit a procedural error warranting reversal by considering documents outside the pleadings; (2) were the Fidelity defendants "functional" fiduciaries of the Plans with respect to the selection of investment options, the structure of the fees, or the provision of information regarding the fee structure; (3) did Deere or the Fidelity defendants breach any fiduciary duties toward plaintiffs, and if so, are they protected by the § 1104(c) affirmative defense; (4) did the district court abuse its discretion in denying plaintiffs' Rule 59(e) motion; and (5) did the court err in its costs award to the defendants, either by giving excessive costs or by including items that are not authorized by 28 U.S.C. § 1920?

1.  Materials Outside Complaint

Deere's motion to dismiss under Rule 12(b)(6) included
a number of attached documents: seven Summary Plan
Descriptions ("SPDs"), two SPD supplements, the Trust
Agreement between Fidelity Trust and Deere, and three
fund prospectuses that it had retrieved from Fidelity's
website. According to plaintiffs, this amounted to some
900 pages of material. Fidelity's motion added two more
trust agreements to the mix. Plaintiffs objected to the
introduction of these documents, arguing that they were
"matters outside the pleadings" within the meaning of
Rule 12(d), and thus that the court should have con-
verted the two motions into motions for summary judg-
ment. The district court, however, found that these were
all documents to which the Complaint had referred, that
the documents were concededly authentic, and that
they were central to the plaintiffs' claim. See *Tierney v.
Vahle,* 304 F.3d 734, 738 (7th Cir. 2002). If the court erred
in this respect, we would be able to dispense with most of
the rest of this appeal, since it would be necessary to
remand on this basis alone.

This court has been relatively liberal in its approach to
the rule articulated in *Tierney* and other cases. See, *e.g.,
Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir.
1994) (upholding consideration of an agreement quoted
in the complaint and central to the question whether a
property interest existed for purposes of 42 U.S.C. § 1983);
*Venture Associates v. Zenith Data Sys.,* 987 F.2d 429, 431 (7th
Cir. 1992) (admitting letters, to which the complaint
referred, that established the parties' contractual relation-

ship); *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 739 (7th Cir. 1989) (permitting reference to a welfare plan referred to in the complaint in order to decide whether the plan qualifies under ERISA). Plaintiffs see the case of *Travel Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423 (7th Cir. 1996), as a counterexample, but we do not read it that way. In *Travel Over the World,* the plaintiffs contested the authenticity of the document that defendants wanted to use; here, they do not. Although they argue that certain statements in the documents are untrue (such as the representation that Deere pays all administrative costs associated with the Plans), the district court took plaintiffs' point of view on all such disputes. Deere and the two Fidelity defendants offered the documents only to show what they disclosed to plaintiffs; nothing plaintiffs have argued explains why the documents could not be used in that limited way.

For the purpose to which they were put, the SPDs, the SPD supplements, and the Trust Agreement fit within the exception to Rule 12(d)'s general instruction. The Complaint explicitly refers to the SPDs and the Trust Agreement, and both are central to plaintiffs' case: the SPDs reveal the disclosures that Deere made to the Plan participants, and the Trust Agreement throws light on the relationship between Fidelity Trust and Deere. The supplements to the SPDs, while not mentioned separately in the Complaint, serve much the same purpose as the originals. The Complaint did not mention the prospectuses, but these were publicly available documents and thus relevant to the question of disclosure. In a similar situation, the Second Circuit held that a court could take

notice of a prospectus in a securities fraud case. See *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991); see also *Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (permitting consideration on a motion for judgment on the pleadings under Rule 12(c) of historical papers relating to negotiation of a treaty with Native American Tribe). Taking into account the limited purpose to which the prospectuses were put here, the district court acted within its discretion when it chose not to convert the defendants' motion under Rule 12(b)(6) to a motion for summary judgment.

### 2. Functional Fiduciaries

Before we delve into the question whether any of the defendants breached a fiduciary duty, we must identify who owed such duties to plaintiffs with respect to the actions at issue here. Deere does not contest the fact that it owed some fiduciary duties to the plan participants; it argues instead that plaintiffs have too expansive a concept of its fiduciary responsibilities and, in any event, that it did not breach any fiduciary duty. Fidelity Trust and Fidelity Research, in contrast, argue that they were not fiduciaries at all. The Hecker group appears to concede that neither Fidelity entity was a named fiduciary under the Trust Agreement. It argues, however, that one or both of the Fidelity entities functioned as a fiduciary under 29 U.S.C. § 1002(21)(A). In order to find that they were "functional fiduciaries," we must look at whether either Fidelity Trust or Fidelity

Research exercised discretionary authority or control over the management of the Plans, the disposition of the Plans' assets, or the administration of the Plans.

The Hecker group first argues that Fidelity Trust exercised the necessary control to confer fiduciary status by its act of limiting Deere's selection of funds through the Trust Agreement to those managed by Fidelity Research. But what if it did? Plaintiffs point to no authority that holds that limiting funds to a sister company automatically creates discretionary control sufficient for fiduciary status. To the contrary, as Fidelity points out, there are cases holding that a service provider does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms. *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.,* 474 F.3d 463 (7th Cir. 2007); *Shulist v. Blue Cross of Iowa,* 717 F.2d 1127 (7th Cir. 1983). In any event, the Trust Agreement gives Deere, not Fidelity Trust, the final say on which investment options will be included. The fact that Deere may have discussed this decision, or negotiated about it, with Fidelity Trust does not mean that Fidelity Trust had discretion to select the funds for the Plans.

Plaintiffs retort that, notwithstanding the language of the Trust Agreement, Fidelity Trust exercised *de facto* control over the selection of the funds and Deere rubber-stamped its recommendations. That is not, however, what the Complaint alleges. It asserts instead that Fidelity Trust "played a role in the selection of investment options," Complaint ¶ 21, and it concedes that Deere had

"final authority," *id.* Merely "playing a role" or furnishing professional advice is not enough to transform a company into a fiduciary. *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535 (7th Cir. 1991); *Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir. 1989). Many people help develop and manage benefit plans—lawyers and accountants, to name two groups—but despite the influence of these professionals we do not consider them to be Plan fiduciaries. This is not a case like *Johnson v. Georgia,* 19 F.3d 1184, 1189 (7th Cir. 1994), on which plaintiffs rely, because in that case the fiduciary both managed a defined-benefits plan and had ultimate authority over the selection of funds. Nor do we find plaintiffs' reference to the district court's decision in *Haddock v. Nationwide Fin. Servs.,* 419 F.Supp. 2d 156 (D. Conn. 2006), helpful or persuasive, since the service provider in that case had the authority to delete and substitute mutual funds from the plan without seeking approval from the named fiduciary.

There is an important difference between an assertion that a firm exercised "final authority" over the choice of funds, on the one hand, and an assertion that a firm simply "played a role" in the process, on the other hand. The Complaint on which the Hecker group proceeded made the latter allegation, not the former. It gave no notice to the defendants that they would be required to defend on the former basis. For that reason, we reject plaintiffs' tardy effort to present the *de facto* fiduciary argument, and we make no comment on the possible scope of the "functional fiduciary" concept.

Plaintiffs also argue that Fidelity Research, and possibly Fidelity Trust, exercised discretion over the disposition of the Plans' assets by determining how much revenue Fidelity Research would share with Fidelity Trust. The Fidelity defendants (with the support in this instance of the Department of Labor) respond that the fees that Fidelity Research collected were not Plan assets under 29 U.S.C. § 1101(b)(1). The fees were drawn from the assets of the mutual funds in question, which, as the statute provides, are not assets of the Plans:

> In the case of a plan which invests in any security issued by a [mutual fund], the assets of such plan shall be deemed to include such security but shall not, solely by reason of such investment, be deemed to include any assets of such [mutual fund].

*Id.* Once the fees are collected from the mutual fund's assets and transferred to one of the Fidelity entities, they become Fidelity's assets—again, not the assets of the Plans. See also *Caremark,* 474 F.3d at 476 n.6.

We conclude that the Complaint fails to state a claim against either Fidelity Trust or Fidelity Research based on the supposition that either one is a "functional fiduciary." Plaintiffs' effort to proceed against these companies thus fails at the threshold.

### 3.  Fiduciary Duties and the Safe Harbor Defense

#### a.  Violation of Fiduciary Duty

We are thus left with the claim against Deere. Plaintiffs' allegations can be distilled into two assertions: (1) Deere

breached its fiduciary duty by not informing the participants that Fidelity Trust received money from the fees collected by Fidelity Research, and (2) Deere imprudently agreed to limit the investment options to Fidelity Research funds and therefore offered only investment options with excessively high fees. We analyze each claim in turn, beginning with the fee distribution.

Critical to plaintiffs' case is the proposition that Deere and Fidelity had a duty to disclose the revenue-sharing arrangements that existed between Fidelity Trust and Fidelity Research. They point to a number of facts in support of their theory. From 1991 through 2007, Deere and Fidelity Trust amended their agreement 27 times to add new Fidelity services and products and to adjust the administrative costs that Deere paid up front to Fidelity Trust. Those costs decreased over time, as Fidelity Trust shifted to a system whereby it recovered its costs from the Deere participants in the same way as it did from outside participants—that is, Fidelity Research would assess asset-based fees against the various mutual funds, and then transfer some of the money it collected to Fidelity Trust.

The Hecker group's case depends on the proposition that there is something wrong, for ERISA purposes, in that arrangement. The district court found, to the contrary, that such an arrangement (assuming at this stage that the Complaint accurately described it) violates no statute or regulation. We agree with the district court. Plaintiffs feel misled because the SPD supplements left them with the impression that Deere was paying the

administrative costs of the Plans, even though in reality the participants were paying through the revenue sharing system we have described. But, as Deere and Fidelity both point out and the Complaint acknowledges, the participants were told about the total fees imposed by the various funds, and the participants were free to direct their dollars to lower-cost funds if that was what they wished to do. The SPD supplements told participants to look to the fund prospectuses for detailed information on fund-level expenses, and the prospectuses in fact furnished that information. In its brief, Deere points to the Magellan Fund Prospectus as an example. That prospectus broke down the Fund's total annual operating expenses paid from fund assets (0.59%) as follows: management fee, 0.39%; distribution or service fees, none; other expenses, 0.20%.

The fact that there were no *additional* fees borne by Deere is immaterial. While Deere may not have been behaving admirably by creating the impression that it was generously subsidizing its employees' investments by paying something to Fidelity Trust when it was doing no such thing, the Complaint does not allege any particular dollar amount that was fraudulently stated. How Fidelity Research decided to allocate the monies it collected (and about which the participants were fully informed) was not, at the time of the events here, something that had to be disclosed. It follows, therefore, that the Hecker group failed to state a claim against Deere based on the revenue-sharing arrangement and the lack of disclosure about it.

These conclusions go a long way toward disposing of plaintiffs' claims that the non-disclosure of the revenue-sharing breached the general fiduciary duty imposed on Deere by 29 U.S.C. § 1104(a)(1). Before such a violation can be found, there must be either an intentionally misleading statement, see *Varity Corp. v. Howe,* 516 U.S. 489, 505 (1996), or a material omission, see *Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986, 992 (7th Cir. 1993). The Complaint does not allege that the representation in the SPD supplement—that Deere paid the administration expenses for the Plans—was an intentional misrepresentation. To the contrary, plaintiffs have since submitted evidence with their Rule 59(e) motion showing that Deere believed that Fidelity Trust's services were free.

The only question is thus whether the omission of information about the revenue-sharing arrangement is material. Deere disclosed to the participants the total fees for the funds and directed the participants to the fund prospectuses for information about the fund-level expenses. This was enough. The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment. Plaintiffs argue that some investors may have expected better management from a fund with a higher fee, but, as the Magellan Fund Prospectus illustrates, participants had access to information about management expenses as a percentage of fund assets. The later distribution of the fees by Fidelity Research is not information the participants needed to know to keep

from acting to their detriment. See *Boxerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 589-91 (7th Cir. 2000). The information is thus not material, and its omission is not a breach of Deere's fiduciary duty.

We turn next to plaintiffs' contention that Deere violated its fiduciary duty by selecting investment options with excessive fees. In our view, the undisputed facts leave no room for doubt that the Deere Plans offered a sufficient mix of investments for their participants. Thus, even if, as plaintiffs urge, there is a fiduciary duty on the part of a company offering a plan to furnish an acceptable array of investment vehicles, no rational trier of fact could find, on the basis of the facts alleged in this Complaint, that Deere failed to satisfy that duty. As the district court pointed out, there was a wide range of expense ratios among the twenty Fidelity mutual funds and the 2,500 other funds available through BrokerageLink. At the low end, the expense ratio was .07%; at the high end, it was just over 1%. Importantly, all of these funds were also offered to investors in the general public, and so the expense ratios necessarily were set against the backdrop of market competition. The fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems).

As for the allegation that Deere improperly limited the investment options to Fidelity mutual funds, we find no statute or regulation prohibiting a fiduciary from selecting

funds from one management company. A fiduciary must behave like a prudent investor under similar circumstances; many prudent investors limit themselves to funds offered by one company and diversify within the available investment options. As we have noted several times already, the Plans here directly offered 26 investment options, including 23 retail mutual funds, and offered through BrokerageLink 2,500 non-Fidelity funds. We see nothing in the statute that requires plan fiduciaries to include any particular mix of investment vehicles in their plan. That is an issue, it seems to us, that bears more resemblance to the basic structuring of a Plan than to its day-to-day management. Compare *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 443-44 (1999); *Lockheed Corp. v. Spink,* 517 U.S. 882, 890 (1996). We therefore question whether Deere's decision to restrict the direct investment choices in its Plans to Fidelity Research funds is even a decision within Deere's fiduciary responsibilities. On the assumption that it is, however, we nonetheless conclude that taking the allegations in the Complaint in the light most favorable to plaintiffs, no breach of a fiduciary duty on Deere's part has been described.

### b.   Safe Harbor Defense

Even if we have underestimated the fiduciary duties that Deere had to its plan participants, the district court's judgment in favor of the defendants must stand if that court correctly decided that the safe harbor provided in 29 U.S.C. § 1104(c) is available to them. This was the

ground on which the district court primarily relied. If the defense is available, it provides an alternate ground for affirmance.

Although ERISA normally imposes a fiduciary duty on plan managers, the statute modifies that rule for plans that provide for individual accounts and allow a participant or beneficiary "to exercise control over the assets in his account." 29 U.S.C. § 1104(c)(1). First, the participant must have the right to exercise independent control over the assets in her account and in fact exercise such control. Next, the participant must be able to choose "from a broad range of investment alternatives," 29 C.F.R. § 2550.404c-1(b)(1)(ii). As we noted in *Jenkins v. Yager*, 444 F.3d 916 (7th Cir. 2006), "prominent among [the conditions a plan must meet] is that it must provide at least three investment options and it must permit the participants to give instructions to the plan with respect to those options at least once every three months. 29 C.F.R. § 2550.404c-1(b)(2)(c)." 444 F.3d at 923. Third, the participant must be given or have the opportunity to obtain "sufficient information to make informed decisions with regard to investment alternatives available under the plan." 29 C.F.R. § 2550.404c-1(b)(2)(i)(B). The regulation sets forth nine criteria that must be met before the participant may be considered to have sufficient investment information. *Id.* Those criteria call for such things as clear labeling of the plan as § 1104(c) instrument, a description of the investment alternatives available, identification of designated investment managers, explanation of how to give investment instructions, a description of "any transaction

fees and expenses which affect the participant's . . . balance in connection with purchases or sales of interests," *id.* § 2550.404c-1(b)(2)(i)(B)(1)(v), relevant names and addresses of plan fiduciaries, special rules for employer securities, special rules for investment alternatives subject to the Securities Act of 1933, and materials related to voting, tender, or other rights incidental to the holdings in the account. Other parts of the regulation emphasize that the fiduciary must furnish extensive information on the operating expenses of the investment alternatives, copies of relevant financial information, and other similar materials. *Id.* § 2550.404c-1(b)(2)(i)(B)(2).

The regulation does not require plans to offer only cost-free investment vehicles. It recognizes that a plan "does not fail to provide an opportunity for a participant or beneficiary to exercise control over his individual account merely because it . . . imposes charges for reasonable expenses." *Id.* § 2550.404c-1(b)(2)(ii)(A). Procedures must be in place, however, to inform participants of the actual expenses incurred with respect to their individual accounts. *Id.* Other parts of the regulation address the required frequency of investment instructions. Finally (for our purposes), the regulation provides that independent control will not be found if a plan fiduciary has concealed material non-public facts regarding the investment from the participant or beneficiary. *Id.* § 2550.404c-1(c)(2)(ii).

The regulation sums up the effect of a finding of independent exercise of control, from the perspective of a plan fiduciary, as follows:

> If a participant or beneficiary of an ERISA section
> 404(c) plan exercises independent control over assets
> in his individual account in the manner described in
> paragraph (c), then no other person who is a fiduciary
> with respect to such plan shall be liable for any loss,
> or with respect to any breach of part 4 of title I of the
> Act, that is the direct and necessary result of that
> participant's or beneficiary's exercise of control.

*Id.* § 2550.404c-1(d)(2)(i). The safe harbor provided by
§ 1104(c) is an affirmative defense to a claim for breach
of fiduciary duty under ERISA. *In re Unisys Sav. Plan
Litig.,* 74 F.3d 420, 446 (3d Cir. 1996).

   Although normally a district court should not base a
dismissal under Rule 12(b)(6) on its assessment of an
affirmative defense, see *U.S. Gypsum Co. v. Indiana Gas
Co.,* 350 F.3d 623, 626 (7th Cir. 2003), that rule does not
apply when a party has included in its complaint "facts
that establish an impenetrable defense to its claims."
*Tamayo v. Blagojevich,* 526 F.3d 1074, 1086 (7th Cir. 2008).
In *Tamayo,* we went on to explain that "[a] plaintiff
pleads himself out of court when it would be necessary to
contradict the complaint in order to prevail on the
merits. . . . If the plaintiff voluntarily provides unneces-
sary facts in her complaint, the defendant may use those
facts to demonstrate that she is not entitled to relief."
*Id.* (internal citations and quotation marks omitted).

   Plaintiffs here chose to anticipate the § 1104(c) defense
in their Complaint explicitly and thus put it in play.
Paragraph 58 begins by noting that "ERISA § 404(c)
provides to Plan fiduciaries a 'Safe Harbor' from liability

for losses that a participant suffers in his or her 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts." Paragraphs 58 through 61 describe the information that Deere, as a plan fiduciary, was required to furnish. Later, the Complaint has a section entitled "Defendants' Non-Compliance with § 404(c)'s Safe Harbor Requirements and Concealment of Its Fiduciary Breaches." Paragraphs 91 through 101 specify exactly what Deere and Fidelity allegedly failed to do. For example, paragraphs 91 and 100(c) and (e) accuse them of failing to disclose that Fidelity was engaged in revenue sharing among its different entities. Paragraphs 93 and 100(b) assert that Plan participants did not have complete knowledge of the fees and expenses that were being charged to the Plans and that were reducing their account balances. Paragraphs 95 and 101(i) charge, among other things, that Deere and Fidelity failed to disclose their agreement that Deere would offer only Fidelity-related funds for the Plans. The district court concluded that the Complaint so thoroughly anticipated the safe-harbor defense that it could reach that issue; we agree with it, bearing in mind that we must still consider any factual allegations in the light most favorable to plaintiffs.

The Hecker group argues that even if the Complaint anticipated the safe-harbor defense, further proceedings are needed because the Complaint did not address all of the 25 or so different requirements that must be met in order to establish it definitively. Deere implies that this overstates the number of requirements, but its primary point is that plaintiffs have waived the right to complain

about the Plans' compliance with all but two criteria—the
obligation to disclose fund-level fees and the level of
expenses (see 29 C.F.R. §§ 2550.404c-1(b)(2)(i)(B)(1)(v)
and (B)(2)(i)). In some instances, it is inappropriate to
jump to the conclusion that a point has been waived
when a case is being decided on the pleadings, but this is
not such a case. Plaintiffs chose to discuss § 1104(c) exten-
sively in the Complaint and to specify the ways in
which the Plans fell short for purposes of the defense. To
shift grounds now would undermine the notice that
defendants gleaned from the Complaint, to their prejudice.

   Restricting our analysis to the challenges in the Com-
plaint, we see no plausible allegation that the Plans
do not comply with § 1104(c). Plaintiffs have focused on
matters that are not helpful to them in the end, namely,
the defendants' failure to disclose non-public material
information, their revenue-sharing arrangements, and
their decision to offer only Fidelity Research mutual
funds. As we have already noted, however, the regula-
tions implementing the safe-harbor defense describe in
detail the expenses and fees that must be disclosed. The fee
distribution by the management company post-collection
is not one of those fees. See 19 C.F.R. §§ 2550.404c-
1(b)(2)(i)(B)(1)(v), (2)(i). And, as we have already ex-
plained, the revenue-sharing arrangement between the
Fidelity defendants is not material information for a
participant's investment decision. The central question
is thus whether the alleged misconduct—the imprudent
selection of mutual funds with excessively high fees— falls
within the safe harbor.

Plaintiffs begin with a broadside attack, asserting that the defense has no application to a fiduciary's "assembling an imprudent menu [of investment options] in the first instance." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3 (4th Cir. 2007). Deere and Fidelity respond that there are no exceptions to § 1104(c)'s safe harbor, which in terms applies to "any" breach committed by someone "who is otherwise a fiduciary." Pinning their hopes on a footnote to the preamble to the implementing regulations, see 57 Fed. Reg. 46,905, 46, 924 n.27 (Oct. 13, 1992), plaintiffs argue that the Secretary has carved out the activity of designating investment options from the safe harbor. Fidelity and Deere respond that this type of informal commentary, which was never embodied in the final regulations, cannot override the language of the statute and regulations.

Plaintiffs would like us to decide whether the safe harbor applies to the selection of investment options for a plan, but in the end we conclude that this abstract question need not be resolved to decide this case. Even if § 1104(c) does not always shield a fiduciary from an imprudent selection of funds under every circumstance that can be imagined, it does protect a fiduciary that satisfies the criteria of § 1104(c) and includes a sufficient range of options so that the participants have control over the risk of loss. *Cf. Langbecker v. Electronic Data Sys. Corp.*, 476 F.3d 299, 310-11 (5th Cir. 2007); and *Unisys*, 74 F.3d at 445 (holding that a fiduciary that committed a breach of duty in making an investment decision for a Plan may nevertheless take advantage of the § 1104(c) defense); but see *DiFelice*, 497 F.3d at 418 n.3.

The regulation addresses the investment options by stipulating that the § 1104(c) defense is available only if the plan offers "a broad range of investment alternatives." 29 C.F.R. § 2550.404c-1(b)(3). The necessary broad range exists "only if the available investment alternatives are sufficient to provide the participant or beneficiary with a reasonable opportunity to" accomplish three goals: the ability materially to affect potential return and degree of risk in the investor's portfolio; a choice from at least three investment alternatives each of which is diversified and has materially different risk and return characteristics; and the ability to diversify sufficiently so as to minimize the risk of large losses. *Id.* §§ 2550.404c-1(b)(3)(i)(A)-(C).

Interestingly, in light of the inclusion of the BrokerageLink facility in the plans available to the Deere participants, the regulation also notes that "[w]here look-through investment vehicles are available as investment alternatives to participants and beneficiaries, the underlying investments of the look-through investment vehicles shall be considered in determining whether the plan satisfies the requirements of [the regulation]." *Id.* § 2550.404c-1(b)(3)(ii). The 2,500 mutual funds available through BrokerageLink had fees ranging from .07% to 1%. Any allegation that these options did not provide the participants with a reasonable opportunity to accomplish the three goals outlined in the regulation, or control the risk of loss from fees, is implausible, to use the terminology of *Twombly*. Plaintiffs complain that non-Fidelity funds were available only through BrokerageLink, but that is immaterial under this regula-

tion. If particular participants lost money or did not earn as much as they would have liked, that disappointing outcome was attributable to their individual choices. Given the numerous investment options, varied in type and fee, neither Deere nor Fidelity (assuming for the sake of argument that it somehow had fiduciary duties in this respect) can be held responsible for those choices.

### 4.  Rule 59(e) Motion to Alter or Amend

After the district court entered judgment, the Hecker group filed a timely motion under FED. R. CIV. P. 59(e) in which it argued that newly discovered evidence supported relief in the group's favor. This evidence, plaintiffs asserted, revealed that Deere did turn over all relevant decisionmaking power to Fidelity and allowed Fidelity to decide such critical matters as what funds to include in the Plans, how much to pay Fidelity Trust (as Trustee), what administrative fees were being assessed against the Plans or charged to participants, and how to allocate the float from interest on Plan assets. The district court denied the motion, finding that it was really an untimely request to amend the Complaint, that plaintiffs had not proffered an amended complaint, and that they had not shown how the new evidence altered any of the court's legal conclusions.

At the outset, it is not even clear that the proffered evidence is new. Fidelity argues that it is not, because plaintiffs possessed the evidence before the district court ruled on the motion to dismiss. Plaintiffs concede that point, but they assert that it is "new" in the sense that they

received it only after the due date for briefs on the mo-
tion. That may be so, but if this evidence was so important
to their case, plaintiffs should have alerted the district
court to their discovery and asked for some appropriate
way to bring it to the court's attention. There was no
reason to sit on potentially relevant evidence and allow the
court to go forward with its decision, and then turn around
and criticize the court for ruling without the benefit of that
same evidence.

That is why this court has held that the assessment of
newness turns on the date of the court's dispositive
order, not on the date when the motions or briefs are
filed. *In re Prince,* 85 F.3d 314, 324 (7th Cir. 1996). Plaintiffs
admit that their experts analyzed the evidence, and the
expert reports were exchanged on June 6, 2007; the
district court did not rule until June 21, 2007.

Plaintiffs also argue that the district court should not
have penalized them for failing to proffer an amended
complaint, on the theory that a plaintiff can amend a
complaint only after the court grants the Rule 59(e)
motion. The last point may be true, but it does not
address the question whether plaintiffs must *show* the
district court what they propose to do. Once judgment
has been entered, there is a presumption that the case is
finished, and the burden is on the party who wants to
upset that judgment to show the court that there is
good reason to set it aside. Thus, in *Twohy v. First Nat'l
Bank,* 758 F.2d 1185 (7th Cir. 1985), this court upheld the
rejection of a Rule 59(e) motion because the plaintiff did
not attach an amended complaint and did not indicate

the "exact nature of the amendments proposed." *Id.* at 1189; see also *Viacom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 785 (7th Cir. 1994) (faulting plaintiff for not attaching a proposed complaint or specifically informing the court how it would cure deficiencies in the earlier complaint). We see no abuse of discretion in this aspect of the district court's decision.

Finally, the new evidence would not have changed the case against Deere, as the district court observed. The court had already approached the case on the assumption that Deere had been imprudent in its selection of investment options. Although the new evidence can be read to disclaim the admission that Deere had the final word on those selections and to give notice that the plaintiffs' theory was that Fidelity was the true actor (and thus the functional fiduciary), the district court was within its discretion to reject this late shift in focus—a shift that would have been highly prejudicial to the defendants.

## 5. Costs Award

We can be brief with respect to the costs order. The district court awarded costs to both Deere and Fidelity, and plaintiffs challenge both awards. First, we address Deere's costs. Deere requested $74,335.52 in costs, and the court awarded it $54,396.57. Plaintiffs quibble about such matters as the number of copies the district court thought reimbursable and the documentation for those copies, but we see no abuse of discretion in the district court's evaluation of those matters. The only potential problem lies with the copies that Deere admits were

made for its own records. We have held that the cost of copies made by an attorney for his or her own records is not recoverable. *McIlveen v. Stone Container Corp.,* 910 F.2d 1581, 1584 (7th Cir. 1990). On the other hand, we have also upheld a cost award to a party for copies made "for its attorneys." *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.,* 924 F.2d 633, 643 (7th Cir. 1991). This is not an argument, however, that plaintiffs have made, and we are reluctant in the face of apparently conflicting decisions from this court to reach out and decide it on our own. Because of the plaintiffs' forfeiture of this potential legal argument and the lack of merit in plaintiffs' other challenges to the Deere costs order, we affirm that order. (We take no position on the issue we have flagged; there will be time enough in a case in which it is properly presented to resolve it.)

Fidelity asked for $186,488.95 in costs, and the court awarded it $164,814.43. While this is a substantial amount, we see no abuse of discretion in the district court's decision. Plaintiffs' principal complaint is that it was improper to award Fidelity its costs for document selection, as opposed to document processing. Fidelity responds that the costs were for converting computer data into a readable format in response to plaintiffs' discovery requests; such costs are recoverable under 28 U.S.C. § 1920. The record supports Fidelity's characterization of the costs, and so we will not disturb the district court's order.

*   *   *

The judgment of the district court is AFFIRMED.